## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

DEBORAH POWELL,

        Plaintiff,

    v.

CHARLES HENDERSON, in his individual
capacity and in his official capacity as interim
and current Chief of Police of the Lexington,
Mississippi Police Department;

THE CITY OF LEXINGTON, MISSISSIPPI;
and

Lexington Police Department Officer JOHN
DOES 1, in his individual capacity,

        Defendants.

Case No. **3:24-cv-815-CWR-ASH**

**COMPLAINT FOR DAMAGES AND
PERMANENT INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiff Deborah Powell ("Deborah") by and through her attorneys, brings this action for

damages and permanent injunctive relief against Defendants Charles Henderson, Officer John

Doe 1, and the City of Lexington, Mississippi. Ms. Powell alleges, based on personal knowledge

and otherwise upon information and belief, the following facts:

### PARTIES

    1.    Deborah is a 56 year-old Black woman who was born and raised Tchula,

Mississippi. She works at Amazon. Ms. Powell currently lives in Tchula, Mississippi, and she

was living there at the time of her arrest on December 30, 2021.

    2.    Defendant Charles Henderson ("Henderson") is a police officer with Lexington

Police Department.  Henderson was appointed Interim Police Chief following the Board of Alderman's vote to remove Sam Dobbins ("Dobbins") as Police Chief.  While Dobbins was Police Chief, Henderson served as his second-in-command, ratifying and carrying out the discriminatory police practices that Dobbins imposed on Lexington. Henderson is the current Police Chief of the Lexington Police Department.

3.      Defendant City of Lexington is a municipality and political subdivision of the State of Mississippi and was, at all relevant times, the employer and principal of Dobbins, Henderson, and the Lexington Police Department.  Dobbins is the former police chief of the Lexington Police Department.  On July 20, 2022, the Lexington Board of Alderman voted to remove Dobbins as chief of police after an audio recording of him was leaked to the public. Throughout the 17-minute recording, Dobbins spews racist and homophobic slurs while boasting about killing Black citizens in the line of duty.  During his tenure as police chief, Dobbins was responsible for setting and enforcing the Lexington Police Department's policies and procedures. Yet, Dobbins set a precedent of discriminatory policing as chief of police in Lexington, a reputation that has followed him throughout his career in law enforcement.

4.      Defendant Lexington Police Department Officer John Doe 1 is, and/or was, at all relevant times an officer of the Lexington Police Department and acted in his capacity as such officer when he was engaged in the actions described herein.  He is sued in his individual capacity.  The true name of John Does 1 is unknown to Plaintiff, and therefore Plaintiff sues this Defendant by fictitious name.  Plaintiff will amend her complaint once his identity is established.

**JURISDICTION AND VENUE**

5.      This civil-rights action arises under 42 U.S.C. § 1983, *inter alia*, and is based on Defendants' violation of Deborah's rights under the Fourth and Fourteenth Amendments of the

United States Constitution.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343 (civil-rights jurisdiction).  The Court can exercise supplemental jurisdiction over Deborah's state law claims under 28 U.S.C. § 1367.

6.    The exercise of general and specific personal jurisdiction over Defendants comports with due process.  Because Henderson resides in Mississippi and the City of Lexington is located in Mississippi, Henderson and the City are subject to general personal jurisdiction in Mississippi courts.  John Doe 1, while serving as an LPD officer, engaged in unconstitutional misconduct in Mississippi that injured Deborah, a Mississippi resident, giving rise to the claims asserted herein.  John Doe 1 thus "commit[ted] a tort in whole or in part in this state" and "perfom[ed] … work or service in this state," such that this Court may exercise specific personal jurisdiction over John Doe 1 under Mississippi's long-arm statute, Miss. Code Ann. § 13-3-57 (2010).  For the same reasons, John Doe 1 personally availed himself of the benefits of Mississippi such that this Court may exercise specific personal jurisdiction over him consistent with the Due Process Clause of the Fourteenth Amendment.  Exercising jurisdiction over John Doe 1 would not offend traditional notions of fair play and substantial justice.

7.    Venue is proper in this District and Division under 28 U.S.C. § 1391(b).  A substantial part of the events giving rise to Deborah's claims transpired in this District and Division—in Lexington, Holmes County, Mississippi.

## FACTUAL ALLEGATIONS

### Race-Based Discrimination Is Entrenched In Lexington and its Police Department

8.    Lexington is a small town in Holmes County, Mississippi, home to approximately 1,547 people.  The city has a long history of segregation and race-based socioeconomic

stagnation.  Eighty-six percent of Lexington's population is Black, but many of Lexington's

political leaders—including the Mayor, the municipal judge, and Defendant former Police Chief

Sam Dobbins—are white.  The percentage of Lexington residents living in poverty is more than

double the national average.  In 1969, the United States Supreme Court ordered Lexington to end

de jure segregation.  *See Alexander v. Holmes Cnty. Bd. of Educ.*, 396 U.S. 1218 (1969) (Black,

Circuit Justice).  Over half a century later, the city's schools remain racially segregated on a de

facto basis.

9.      Local law enforcement has long perpetuated this racial divide.  As far back as

1963, the local sheriff's office employed violence—including firebombing and shooting—to

prevent Lexington's Black residents from registering to vote.

10.     The LPD acknowledged "problems with misconduct within our department"

when it implemented a complaint-reporting system for Lexington residents in 2011.  *See* Justin

Purdy, Lexington Police Offer Avenues For Complaints at Local Meeting, Holmes County

Herald (Aug. 18, 2011).

11.     Misconduct is still rampant and increased with the appointment of Sam Dobbins

as the city's Chief of Police (and increased further with the subsequent appointment of

Defendant Charles Henderson as the city's Chief of Police).

12.     Upon taking the job as Police Chief in 2021, Dobbins pledged to use his position

to generate revenue for Lexington and to enrich himself and his fellow LPD officers.  Dobbins

reportedly promised to make a "million dollars" for Lexington by extracting fines from

Lexington's primarily Black residents, and he boasted to colleagues that he would drum up

enough cash to buy them new cars.

13.     To accomplish these ends, Dobbins devised, supervised, and implemented a

"Stop-and-Fine" scheme by which he and his officers would—among other unconstitutional practices—stop and detain Lexington's Black citizens, arrest them on bogus charges, and coerce them into paying exorbitant and often arbitrarily imposed cash "fines" in exchange for their release from custody. As part of this scheme, Dobbins and the LPD told jail personnel that detainees had waived their initial appearances or preliminary hearings—meaning these people were not appearing before a judge and the LPD's threats of prolonged detention had teeth.

14.    Dobbins and his subordinates also refused to accept payments in any form other than cash, and often failed to provide receipts or documentation of the payments. Henderson, as Dobbins's second-in-command, was the primary enforcer of this "Stop-and-Fine" policy.

15.    Former LPD officers have corroborated this policy. For example, former LPD officer Ebony Huntly recounted that Dobbins personally instructed her to add false charges against a detainee for the purpose of extracting more money from her, and that Dobbins regularly added "resisting arrest" and "failure to comply" charges against individuals who neither resisted nor failed to comply.

16.    Former LPD deputy Billy Reed has confirmed that Dobbins personally imposed excessive "fines" after each arrest, and that the LPD detained residents for days while their friends and family scrounged together enough cash to comply with Dobbins's demands. As further explained below, the Department of Justice also corroborated this policy, finding that LPD stops and arrests people without probable cause and brings inflated charges in part to collect fines and fees that help fund the department.

17.    Dobbins's "Stop-and-Fine" scheme has borne fruit: In July 2021, Dobbins's first month on the job, Lexington's monthly revenue from traffic fines (issued for such alleged violations as failing to wear a seatbelt, following too close, and disturbing the peace) skyrocketed

from roughly $2,500 the previous month to over $15,000.  By March 2022, just eight months

later, monthly revenue from traffic fines exceeded $30,000.  That works out to about $20 per

resident—in one month alone.

18.     This scheme has resulted in the unlawful arrest, extortion and mistreatment of

Lexington's Black residents and specifically affected both Deborah Powell and her son Andrial

Young.

### The Unlawful Arrest of Andrial Young

19.     On November 22, 2021, Andrial Young was pulled over by three Lexington

Police officers while stopped at a red light, allegedly for failing to wear a seatbelt – despite

having one on.  Three police officers approached the driver's side of his vehicle, one of which

was the Chief of Police, Sam Dobbins.  Upon reaching Andrial's window, the police claimed that

they smelled marijuana and requested permission to search the vehicle.  Andrial declined the

search, asserting that there was no marijuana in his vehicle.

20.     Despite his refusal, the police officers removed Andrial from his car, placed him

in handcuffs, and proceeded to search his vehicle against his objections.

21.     The police did not find any illegal substances during their search.

22.     Andrial was not read his Miranda rights nor informed of the reason for his arrest

at any point during this interaction.  After completing their search, the police arrested Andrial

and transported him to the local police station.

23.     Andrial remained handcuffed and detained for eight hours, and his vehicle was

subsequently towed.

### Demand for Cash and Subsequent Court Proceedings

24.     Upon learning of her son's arrest by telephone, Deborah Powell immediately

drove two and a half hours from Memphis, Tennessee to Lexington. Upon arriving at the Lexington Police Station, she was informed that Andrial had been arrested for the possession of a bag of marijuana.

25.     Deborah requested that Andrial be issued tickets for his alleged infractions and released.

26.     The police officer who arrested Andrial arrived and issued two tickets—one for not having a valid driver's license and another for lacking insurance.

27.     The officer demanded $500 in cash to cover the fines for the tickets and to secure Andrial's release.

28.     After making the $500 cash payment, Deborah received four receipts, even though Andrial only received two tickets.

29.     When asked what the additional receipts were for, the officer responded that one was for the drug charge, one was for not wearing a seat belt, one was for not having insurance, and another for an invalid driver's license.

30.     Andrial was subsequently released and was forced to pay an additional $100 to retrieve his truck out of the tow yard.

31.     Due to this unjust arrest, Andrial was forced to attend court approximately seven times. However, each court appearance proved inconclusive, as the court could not find sufficient evidence to support his alleged infractions, leading to continuous rescheduling of new court dates. Andrial had to miss work and forego pay for each of these court appearances.

32.      For example at court, Defendant Dobbins testified that he issued a ticket to Andrial for driving without a license, but Andrial had a license, so the judge ordered his money be refunded for that citation. Dobbins then testified that Andrial paid a fine for not wearing a

seatbelt, but LPD did not issue a ticket for that infraction, so the judge ordered that fine be refunded as well. Defendant Henderson interjected in court, "what about the drugs?" Since there were no drugs and no ticket was issued for drugs, the judge ordered everyone to go back to the LPD station and get the citations straightened out.

33.     Ultimately, the court dismissed the charges due to the lack of evidence and factual support for the citations.  Despite the dismissal, each court appearance caused Andrial to lose approximately $120 per day in wages due to work absences.

**<u>Abuse of Deborah Powell</u>**

34.     On December 30, 2021, Deborah went into the police station to receive reimbursement for Andrial's tickets, as ordered by the court, but was instructed to leave by Henderson.  Deborah explained that she was waiting for the police chief to process the reimbursement.

35.     Following this conversation, she was physically confronted, grabbed by her shoulder, thrown against the wall, and subsequently grabbed by the arm and neck before being thrown to the floor.  Henderson pinned Deborah to the floor by keeping his knee on her back. Henderson then handcuffed her, stating, "your ass is going to county."  Deborah vocally asserted that she was merely waiting for her money. Henderson proceeded to take her to the car and transport her to jail.

36.     Deborah spent five days and four nights in jail.  Throughout this time, her throat was severely injured and sore.  Due to this injury, she was unable to eat throughout her time in jail and began to feel faint.  Her request to see a doctor was denied, and she was told they could not take her to a doctor.  Deborah was released only after Andrial paid bail of approximately $400-$500.

37.     At this time, Deborah and her son have received no justice or assistance despite experiencing numerous violations of their constitutional rights.

### The Department of Justice's Investigation of the Lexington Police Department and the City of Lexington, Mississippi

38.     On November 8, 2023, the United States Department of Justice ("DOJ") initiated an investigation of the Lexington Police Department.  (Findings Report ("Rep."), attached as Exhibit A at 1).

39.     Following the investigation, the DOJ found that "LPD deliberately targets Black people when carrying out its low-level enforcement strategy." (Rep. at 32).

40.     Starting in July of 2021 when Defendant Dobbins became the Police Chief, there was a significant increase in racial disparities in arrests by the LPD, and the disparities *increased* under Defendant Henderson.  (Rep. at 34)

41.     In 2019, the LPD was 2.5 times more likely to arrest Black individuals than White individuals.  By 2022, the LPD was twelve times more likely to arrest Black individuals than White individuals, and this disparity further increased in 2023 when Black individuals were 17.6 times more likely to be arrested.  (Rep. at 34).

42.     Starting in 2022, the LPD increased traffic offense arrests – as opposed to issuing citations – of Black people.  LPD arrested three people total for traffic offenses in 2017, but made over a hundred traffic offense arrests in 2022.  "Within Holmes County, such high arrest rates for traffic violations appear to be unusual.  In 2022, LPD jailed nearly four times as many people for traffic violations as five neighboring jurisdictions, plus the Homes County Sheriff's Office, combined."  Further, "although white people comprise about a fifth of Lexington's population, in 2022 and 2023, LPD arrest only four white people for traffic offenses" (out of more than 180

arrests).  (Rep. at 35).

43.     The LPD has a practice of making unjustified arrests.  (Rep. at 2).  The DOJ corroborated LPD's "Stop-and-Fine" scheme.  (Rep. at 14-15).  The DOJ found that "LPD arrests people for conduct that does not meet the elements of the charged offense" and "stops people for conduct that is manifestly not criminal—even though the Fourth Amendment requires that stops be justified by reasonable suspicion of a crime." *Id.* at 14.  The DOJ further found, "[e]ven when LPD has a basis to make a stop or an arrest, officers regularly bring inflated charges or add additional charges unsupported by the law." *Id.*  LPD benefits from stopping and arresting people without probable cause and inflating charges because "[e]very charge generates a separate fine. Thus, the more charges LPD brings, the more money LPD gets. And since many people pay the fines for their charges directly to the police instead of litigating in court, even baseless charges can bring in cash." *Id.* at 14-15.  The DOJ concluded, "[u]ltimately, LPD officers aim to charge people for as many crimes as they can, often without regard to the evidence and the law." *Id.* at 15.

44.     The LPD also has a practice of conducting illegal searches, "search[ing] people and their property without justification."  (Rep. at 2, 8).  The LPD deliberately misrepresents facts to justify searches, and improperly uses "inventory searches" of vehicles "to search any car they tow for evidence of crimes – not to actually make an inventory of valuables."  (Rep. at 18).

45.     Individuals reported to the DOJ that picking up children from school or driving to work "feels like a high-stakes gamble on their liberty and financial security" because "LPD's unconstitutional conduct deeply harms the Lexington community." (Rep. at 44).

46.     The DOJ concluded that "Lexington and LPD violate people's rights at every stage of their interaction with them – during initial encounters with the police, when police detain and arrest them, and even after the person is in jail."  Further, "LPD has a persistent pattern or practice

of unconstitutional conduct."  (Rep. at 3 & 8).

47.    A former LPD officer has admitted that the LPD regularly let white people leave without a ticket or arrest after a traffic stop, but "never did that for people who were Black.  They would arrest the person and take their car."  (Rep. at 36).

48.    The LPD uses improper fines to fund the police department itself.  In 2022, the DOJ found that the LPD's revenue from fines increased sevenfold (from $30,000 annually to over $240,000):  (Rep. at 11).  The DOJ found, "[i]n 2023, Lexington collected more than $220,000 from fines, which made up nearly a quarter (23 percent) of LPD's budget."  *Id*.



(Rep. at 11).

49.    The DOJ recommended numerous reforms that should be undertaken by the LPD, including policies, training and supervision aimed at ensuring that: officers are not unlawfully discriminating against Black people; officers use constitutional standards when utilizing force during stops, searches and arrests;  detentions, arrests and the setting of money bail are constitutional and lawful; and officers' conduct is assessed and reviewed, including any complaints/allegations of officer misconduct, *inter alia*.  These recommended policies, training

and supervision have not been in place prior to the DOJ's report dated September 26, 2024.

## CLAIMS FOR RELIEF

### Count I (42 U.S.C. § 1983)

### Unreasonable Search and Seizure in Violation of the Fourth and Fourteenth Amendments

### (asserted against Defendants Henderson and the City of Lexington)

50.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

51.    42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

52.    It is clearly established that an officer may not conduct a warrantless seizure or detention of an individual absent "reasonable suspicion that criminal activity is afoot." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020).

53.    By physically confronting Deborah at the police station, Henderson deprived Deborah of her clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

54.    An officer "seizes" an individual when (a) the officer makes a show of authority, and (b) the individual submits to that show of authority. *United States v. Wright*, 57 F.4th 524, 530-31 (5th Cir. 2023). Submission to a show of authority depends on whether a plaintiff "objectively appeared to believe [s]he was not free to leave." *Id.* at 533. Reasonable suspicion must be supported by "particular and articulable facts, which, taken together with rational

inferences from those facts, reasonably warrant an intrusion." *Gonzalez v. Huerta*, 826 F.3d 854, 856 (5th Cir. 2016).

55.     Henderson "seized" Deborah at the police station the moment he grabbed her shoulder, threw her against the wall, grabbed her by the arm and neck, threw her to the floor, pinned her down with his knee, and handcuffed her.  Henderson's aggressive physicality towards Deborah, along with the display of "POLICE" on his outerwear, the outward display of his badge, and his visible gun, constituted a sufficient show of authority that no reasonable person would understand that they were free to leave the police station.  When Henderson assaulted and handcuffed her while stating, "your ass is going to county," Deborah did not attempt to leave, resist, or otherwise show defiance; to the contrary, she pleaded that she was only there for reimbursement for her son's tickets.  *See Wright*, 57 F.4th at 432-33 (holding criminal defendant was "seized" under the Fourth Amendment, notwithstanding his refusal to comply with the police officer's order to stay in the car, because the defendant "d[id] not show defiance," but rather exited the car slowly, turned to the officer with arms extended, and stated he did not do anything).

56.     This seizure was unreasonable and conducted with reckless indifference for Deborah's constitutional rights, in that Henderson did not have any specific, articulable facts suggesting Deborah was involved in any criminal activity.  When Henderson seized Deborah, Deborah had just arrived at the police station to follow the judge's orders to return there for reimbursement for her son's tickets.  She was not behaving violently or disruptively, and she was not causing any disturbance.  She had been at the police station for no longer than 4 minutes when Henderson physically confronted her and put her in handcuffs.

57.     Henderson unlawfully stopped and seized Deborah in accordance with and in

furtherance of the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Alderman.  As described above, Henderson and Dobbins had a practice of stopping Black individuals and giving them tickets with no grounds to do so.  They would then proceed to collect fines from these individuals for their release from custody.  Moreover, they only accepted the fines in cash, leaving no paper trail of the payments, as they often did not provide individuals with receipts.  Henderson, in his official capacity as Chief of Police, and the City of Lexington are therefore liable for this violation of Deborah's constitutional rights pursuant to Lexington Police Department's unconstitutional stop-and-fine policy.

### Count II (42 U.S.C. § 1983)

### Unlawful Arrest in Violation of the Fourth and Fourteenth Amendments
### (asserted against Defendants Henderson and the City of Lexington)

58.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

59.    By arresting Deborah without probable cause, Henderson deprived Deborah of her clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

60.    It is clearly established that a warrantless arrest is objectively unreasonable if the arresting officer lacks probable cause.  *United States v. Watson*, 423 U.S. 411, 417-24 (1976); *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017).

61.    "Probable cause is established by facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in

believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quotation omitted). This standard incorporates the "expertise and experience of the law enforcement officials." *United States v. Nunez-Sanchez*, 478 F.3d 663, 667 (5th Cir. 2007) (citations omitted).

62.     Deborah went to the police station to follow the court's order to return there to receive reimbursement for Andrial's tickets. Henderson, the assistant police chief, instructed her to leave. Deborah responded by explaining that she was waiting for the police chief to process the reimbursement. Henderson then physically confronted her, grabbed by her shoulder, and threw her against the wall. He then grabbed her by the arm and neck and threw her to the floor. Henderson then handcuffed her, stating, "your ass is going to county." Deborah vocally asserted that she was merely waiting for her money. Henderson proceeded to take her to the car and transport her to jail.

63.     No facts or circumstances could have existed within Henderson's knowledge at the time of Deborah's arrest that would have been sufficient to warrant a reasonable police officer believing she had committed any crime. Nor could a reasonable police officer under the circumstances have believed that Deborah had engaged in disorderly conduct by following the judge's orders to return to the station to obtain reimbursement for false fines.

64.     Henderson unlawfully arrested Deborah in accordance with and in furtherance of Defendants' "Stop-and-Fine" scheme, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Aldermen. Henderson, in his official capacity as Chief of Police, and the City of Lexington are therefore liable for the violation of Deborah's constitutional rights, as the

violation occurred under the Lexington Police Department's official stop-and-fine policy.

65.    In depriving Deborah of her rights under the Fourth Amendment, Henderson

acted with evil intent and reckless indifference for Deborah's constitutional rights under color of

law in his capacity as a Lexington police officer.

### COUNT III (42 U.S.C. § 1983)

### Excessive Force in Violation of the Fourth and Fourteenth Amendments
### (asserted against Defendant Henderson and the City of Lexington)

66.    Deborah incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

67.    By forcefully grabbing Deborah by her neck, hurling her to the floor, and placing

her in handcuffs, Henderson deprived Deborah of her clearly established right to be free from

excessive force during a search or seizure under the Fourth Amendment, as made applicable to

the states by the Due Process Clause of the Fourteenth Amendment.

68.    "To prevail on an excessive force claim, a plaintiff must show '(1) an injury that

(2) resulted directly and only from the use of force that was excessive to the need and that (3) the

force used was objectively unreasonable.'" *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018)

(quoting *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017).

69.    "[A]s long as a plaintiff has suffered some injury, even relatively insignificant

injuries and purely psychological injuries will prove cognizable when resulting from an officer's

unreasonably excessive force." *Id.*  "The objective reasonableness of the force, in turn, depends

on the facts and circumstances of the particular case, such that the need for force determines how

much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).

The relevant facts and circumstances that govern the need for force include "the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).

70.    It was clearly established at the time of Deborah's arrest that when nothing about a suspect's "statements or actions indicated that [she] posed any risk of harm to the officers" or flight risk, "throwing [that person] onto the ground, kneeing [her] in the back, and pushing [her] face into the concrete," is objectively unreasonable under the Fourth Amendment. *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

71.    No reasonable officer could have believed that the facts and circumstances leading up to Deborah's arrest warranted the degree of force employed against her, which included grabbing her by the throat, hurling her to the floor, pinning her down, and roughly placing handcuffs around her wrists.  Even assuming Henderson suspected that Deborah was at the police station for an improper reason—and, as shown, he had no reasonable basis for that suspicion—Deborah was plainly not a danger to herself or others.  Deborah was neither fleeing nor resisting arrest.  In short, it would have been clear to any objective, reasonable officer that no force was necessary at all.

72.    Deborah's injuries as a result of the arrest are more than *de minimis*.  Her injuries include a bruised neck and disorientation from being choked and thrown to the floor, and psychological trauma from being subjected to such physical force.  Deborah continues to suffer from fear and paranoia while visiting Lexington.

73.    Henderson unlawfully used force against Deborah in accordance with, and in furtherance of the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Alderman.  Henderson, in his official capacity as

Chief of Police, and the City of Lexington are therefore also liable for this violation of Deborah's constitutional rights, as the violation occurred under the Lexington Police Department's official stop-and-fine policy.

74.     In depriving Deborah of her rights under the Fourth Amendment, Henderson acted with evil intent and reckless indifference for Deborah's constitutional rights under color of law in his capacity as a Lexington police officer, and his actions and omissions were conducted within the scope of his official duties of employment.  This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

### COUNT IV (42 US.C. § 1983)

### (Excessive Detention Without Probable-Cause Hearing in Violation of the Fourth and Fourteenth Amendments (asserted against Defendant Henderson and the City of Lexington))

75.     Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

76.     By unreasonably denying Deborah a prompt probable-cause hearing before a neutral magistrate while she was detained in the Holmes County Jail, Henderson deprived Deborah of her clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment, as made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

77.     It is clearly established that depriving a warrantless arrestee of a prompt probable-cause determination violates the Fourth Amendment when the delay or denial is "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or [a] delay for delay's sake."  *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Brown v. Sudduth*, 675 F.3d 472, 477-81 (5th Cir. 2012).

78.     Henderson detained Deborah for five days and four nights in jail without any

reasonable basis for failing to present her for a probable-cause hearing and based on an arrest without probable cause. Henderson never represented to Deborah that a magistrate was unavailable, nor was Deborah intoxicated or otherwise disorderly such that holding her in jail overnight—let alone for five days and four nights—would have been appropriate. This violated Deborah's right to a probable cause hearing within forty-eight hours of detention, as clearly established by the United States Supreme Court in *McLaughlin*.

79.     Instead, Henderson purposefully withheld a probable-cause hearing from Deborah for illegitimate purposes, motivated by "ill will" toward her. Henderson intentionally delayed his detention of Deborah to extort her into paying bogus "fines" and to retaliate against Deborah for coming to the police station to seek repayment of her son's false tickets. Henderson sought to punish Deborah for questioning the Lexington Police Department's authority and for exposing the police department's discriminatory policing practices by obtaining an order from the court requiring them to refund Andrial's tickets.

80.     Henderson unlawfully detained Deborah in accordance with the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Aldermen. Henderson, in his official capacity as Chief of Police, and the City of Lexington are therefore also liable for this violation of Deborah's constitutional rights, as the violation occurred under the Lexington Police Department's official stop-and-fine policy.

**COUNT V**

**Deprivation of Property Without Due Process of Law in Violation of the Due Process
Clause of the Fourteenth Amendment
(asserted against Defendants the City of Lexington and John Doe 1)**

81.     Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

82.     Defendant John Doe 1's extortion of $400-$500 from Deborah to cover the fines for the tickets and secure Andrial's release was a denial of her clearly established right to be free from the deprivation of her property without due process of law under the Due Process Clause of the Fourteenth Amendment.

83.     Whether a deprivation of property interest violates due process depends on: (1) "the private interest that will be affected by the official action,"(2) "the risk of an erroneous deprivation of such interest through the procedures used," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

84.     It is clearly established that conditioning one's release from jail on the surrender of property requires process that includes, at a minimum, notice and an opportunity to be heard and contest the deprivation. *See, e.g., Craig*, 861 F. Supp. at 1297 (holding it was "clearly established" that an arrestee may not be coerced into signing a disclaimer of interest in seized property in exchange for release from jail without due process of law) (citing *Brewer v. Blackwell*, 692 F.2d 387, 399 (5th Cir. 1982)).

85.     First, the private interest at stake for Deborah is far from trivial: a property interest in the amount of $400-$500.  As set forth above, Defendants' taking of Deborah's money meaningfully and permanently deprived Deborah of her right to that money.

86.     Second, the risk of erroneous deprivation due to Defendants' "Stop-and-Fine" scheme is exceedingly high, as Deborah had to surrender her money without any process at all, in connection with the baseless citations the officers had issued Andrial.  Indeed, the court ultimately dismissed the charges due to the lack of evidence and factual support for the citations.

87.     Third, there is no legitimate governmental interest in conditioning release from

detention on cash payments without notice or the opportunity to contest the deprivation. The facts and circumstances of Andrial's and Deborah's arrests—including Defendants' broader pattern of manufacturing charges against Lexington residents for the purpose of extracting cash fines—suggest that the lack of judicial process was a feature, not a bug, of Defendants' policing and money-making scheme.

88.     Dobbins and the two accompanying officers who stopped Andrial, Henderson, and the officer who required payment of $400-$500 for Andrial's release unlawfully deprived Deborah of her property in accordance with and in furtherance of the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Aldermen.  The City of Lexington is therefore also liable for the violation of Deborah's constitutional rights.

89.     In depriving Deborah of her rights under the Fourteenth Amendment, Dobbins, the two other officers who stopped Andrial, Henderson, and the officer who required Andrial's payment acted with evil intent and reckless indifference for Deborah's constitutional rights under color of law in their respective capacities as Lexington police officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

## COUNT VI

### 42 U.S.C. § 1983 against Henderson and the City of Lexington for Racial Discrimination in Violation of the Fourteenth Amendment (Equal Protection)

90.     Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

91.     Deborah's right to equal protection under the law is protected by the Fourteenth Amendment to the U.S. Constitution.

92.     Henderson was, at all times relevant herein, an employee of the Lexington Police Department.  Henderson conducted the acts alleged above within the scope of his employment or duties.

93.     As a Black woman, Deborah is a member of a constitutionally protected class.

94.     Henderson treated Deborah differently than similarly situated individuals who are not members of a constitutionally protected class.

95.     As more fully described above, Henderson (and the LPD) disproportionately arrested Black people and told them they would be released if they paid a large sum in cash directly to the Lexington Police Department.

96.     As more fully described above, Henderson acted with an intentionally discriminatory purpose when physically confronted and arresting Deborah.

97.     Henderson acted with discriminatory purpose in accordance with and in furtherance of the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Aldermen.  The City of Lexington is therefore also liable for the violation of Deborah's constitutional rights.

98.     As a result of this unlawful misconduct, Deborah was injured, including by losing liberty and income and suffering emotional damage and mental distress.  Henderson is therefore liable for damages in an amount to be proven at trial.  Deborah is likely to be subject to further racial discrimination without injunctive relief due to being a Black woman who lives near Lexington, MS, an area where the law enforcement disproportionately arrests Black people.

Because Henderson remains the Chief of Police, without an injunction, there will likely be no change in Lexington Police Department's discriminatory practices. Henderson continues to further the "Stop-and-Fine" policy that Dobbins implemented, and does so in a way that disproportionately affects Black people. Without an injunction, Henderson will be free to continue to arrest individuals like Deborah.

## COUNT VII

**Violation of the Right to Free Speech Under the First Amendment (42 U.S.C. § 1983)**

**(asserted against Defendant Henderson)**

99.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

100.    The First Amendment of the United States Constitution guarantees all citizens freedom of association and the right to petition the government, including the right to criticize the government and government officials. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991).

101.    The First Amendment also protects individuals against retaliation for engaging in constitutionally protected activity. *Hartman v. Moore*, 547 U.S. 250, 256 (2006)

102.    Henderson's arrest of Deborah for requesting that Dobbins and Henderson return the money they had unlawfully collected from her for Andrial's release violates Deborah's rights to free speech, association, and to petition the government for redress as guaranteed by the First and Fourteenth Amendments of the Constitution. Henderson lacked probable cause for Deborah's arrest.

103.    Defendants maintain a concerted ongoing policy, custom, or practice of targeting dissident Lexington citizens for arrest and harassment when they object to police mistreatment

and abuse. In fact, Lexington Police Department officers have made public profanity arrests even as people expressly referenced their right to free speech.  (Rep. at 13).

## COUNT VIII

### Conversion of Personal Property or Chattel

### (asserted against the City of Lexington and John Doe 1)

104.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

105.    A plaintiff may assert a claim for conversion where (1) there is a wrongful possession; (2) in exclusion or defiance of the owner's right; and (3) the title of the lawful owner is known. *Covington Cnty. Bank v. Magee*, 177 So. 3d 826, 829 (Miss. 2015).

106.    The officer who required Andrial's payment's coerced collection of $400-500 from Deborah under the threat of prolonged detention of Andrial constitutes a wrongful possession of property to the exclusion or defiance of Deborah's superior right to that amount. The officer deprived Deborah of that money knowing full well that she was entitled to keep it. Dobbins's, the officers', and Henderson's wrongful possession of Deborah's property was motivated by malice towards her.

107.    The officer's coerced collection was in accordance with and in furtherance of the City of Lexington's "Stop-and-Fine" policy, as promulgated, implemented, and enforced by Dobbins as a municipal policymaker, with the knowledge, ratification, and support of the City's Mayor and the Board of Aldermen.  The City of Lexington is therefore also liable for the violation of Deborah's constitutional rights.

## COUNT IX

### 42 U.S.C. § 1983 (Monell) against the City of Lexington for the Policy or Custom of Unconstitutional Arrests and Detentions in Violation of the Fourth and Fourteenth Amendments under Police Department Senior Policymaker Dobbins

108.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

109.    At all relevant times, Lexington Police Chief Dobbins was a final policymaker of the City of Lexington for the conduct of the Lexington Police Department and the officers and other personnel in his command, including but not limited to the other Individual Defendants, who created, expressly or tacitly communicated, directed, fostered and perpetuated a spoken or unspoken policy or custom of unconstitutionally carrying out arrests without probable cause, targeting Black individuals, and holding them in jail, sometimes demanding cash payments for their release, in violation of their Fourth and Fourteenth  Amendment rights and of Mississippi law.

110.    Through the actions and omissions of Dobbins, the City of Lexington established and maintained a policy or custom of violating the Fourth and Fourteenth Amendment rights of citizens or other persons within the jurisdiction of the U.S. by unlawfully arresting and detaining people and demanding illicit cash payments to be released from detention.  Specifically, Lexington police officers including Henderson and Dobbins had a practice of arbitrarily stopping Black residents and giving them tickets for made up violations.  LPD officers including Henderson and Dobbins would then proceed to collect fines from these individuals for their release of custody.  Dobbins reportedly promised to make a "million dollars" for Lexington by extracting fines from Lexington's primarily Black residents.  Dobbins even boasted to colleagues that he would drum up enough cash to buy them new cars.  That is precisely what happened with Deborah and her son Andrial, where Andrial was stopped on unfounded charges and Deborah had to pay the fine for the tickets and secure Andrial's release.

111.    In addition, the unconstitutional misconduct of Dobbins and the other Individual

Defendants was so conspicuous and pervasive that senior Lexington policymakers above

Dobbins either knew of the Police Department's custom and policy of violating arrestees'

constitutional rights or turned a blind eye to the horrific facts; by doing nothing, they tacitly

endorsed and perpetuated it.

112.    As a direct and proximate result of the City of Lexington's policies, practices, and

customs, Deborah was injured, including by losing liberty and income and suffering emotional

damage and mental distress. The City of Lexington is therefore liable for damages in an amount

to be proven at trial.

## COUNT X

**42 U.S.C. § 1983 - (Monell) Against City of Lexington for the Policy or Custom
of Unconstitutional Arrests and Detentions in Violation of the Fourth Amendment
Established by its Reckless Appointment of Dobbins as Police Chief Without Due Diligence
and its Failure to Investigate, Train, or Supervise Lexington Police Chief**

113.    Deborah incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

114.    When they appointed Dobbins as Lexington Chief of Police, Lexington final

policymakers knew of, recklessly disregarded or deliberately ignored substantial evidence of his

prior violations of Mississippi law and the United States Constitution while serving in law

enforcement departments of other Mississippi municipalities and counties.

115.    During Dobbins's yearlong tenure as Lexington Police chief, Lexington final

policymakers knew of, recklessly disregarded or deliberately ignored additional reports of

unconstitutional and unlawful arrests and imprisonment of Black persons in Lexington by

Dobbins and others under his command.   They failed adequately to investigate or to respond to

such reports or to put in place appropriate training, oversight, supervision or other safeguards to

protect people against such violations of law and of the U.S. Constitution.

116.    During Dobbins's tenure as Lexington Police Chief, such other senior policymakers acted or failed to act with deliberate indifference to violations by Dobbins and the Lexington Police Department of peoples' constitutional rights.  As stated above, Dobbins and the Lexington Police Department arrested and fined primarily Black residents with the intent to collect money from them based on meritless arrests and detentions.  These actions were done on such a regular basis that Dobbins reportedly planned to make a "million dollars" for Lexington by extracting fines from Lexington's primarily Black residents.

117.    By such behavior, such Lexington senior policymakers established, condoned and fostered a municipal custom and policy of unconstitutional acts and practices carried out through Dobbins and the Lexington Police Department.

118.    As a direct and proximate result of that custom and policy of the City of Lexington, Deborah was injured, including by losing liberty and income and suffering emotional damage and mental distress. The City of Lexington is therefore liable for damages in an amount to be proven at trial.

## COUNT XI

### Violation of Title VI of the Civil Rights Act of 1964

### (asserted against the City of Lexington)

119.    Deborah incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

120.    The City of Lexington received federal funding at the time of Deborah's arrest because Lexington Police Department was awarded $147,476 through the COPS Hiring Program in 2020, an award covering a percentage of officer salaries for three years. As a program receiving Federal financial assistance, City of Lexington is subject to Title VI of the Civil Rights

Act of 1964, at minimum, from 2020-2023.

121.    Deborah, as a visitor of Lexington, was an intended beneficiary of the Lexington

Police Department's services.

122.    As more fully described above, the City of Lexington intentionally discriminated

against Deborah and this discrimination was so severe, pervasive and objectively offensive that it

denied Deborah equal treatment under law.

123.    As a result of this unlawful misconduct, Deborah was injured, including loss of

liberty, unlawful bond, emotional damage, and mental distress.  The City of Lexington is

therefore liable for damages in an amount to be proven at trial.

**COUNT XII**

**Civil RICO**

**(asserted against Henderson and John Doe 1 in their individual capacities)**

124.    Deborah incorporates by reference and realleges all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

125.    It shall be unlawful for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt.  18 U.S. Code § 1962 (c).

126.    A person is guilty of extortion if he purposely obtains or attempts to obtain

property of another or any reward, favor, or advantage of any kind by threatening to inflict

bodily injury on any person or by committing or threatening to commit any other criminal

offense, violation of civil statute, or the public or private revelation of information not previously

in the public domain for the purpose of humiliating or embarrassing the other person, without

regard to whether the revelation otherwise constitutes a violation of a specific statute.  Miss. Code § 97-3-82.

127.    Dobbins created the stop-and-fine policy that the City of Lexington knew and ratified.  Dobbins, Henderson and other Lexington Police Department officers carried out Lexington's illegal policy.

128.    The Lexington Police Department demand that Black individuals pay fines or "debts" to the Department or go to jail.  (Rep. at 2).

129.    Deborah is not the only person that Dobbins and Henderson have extorted. Dobbins and Henderson have extorted Lexington residents throughout their time with the Lexington Police Department.  Indeed, Dobbins devised, and both Dobbins and Henderson supervised, and implemented a "Stop-and-Fine" scheme by which officers would—among other unconstitutional practices—stop and detain Lexington's Black citizens, arrest them on bogus charges, and coerce them into paying exorbitant and often arbitrarily imposed cash "fines" in exchange for their release from custody.

130.    Dobbins and Henderson were employed by the City of Lexington, with the Lexington Police Department.  Dobbins and Henderson acted as Police Chief and police officer, respectively, for the Lexington Police Department.  Dobbins served as Police Chief for about one year and Henderson was a police officer, and Dobbins's second in command, until he was appointed as Interim Police Chief after Dobbins's removal from the position in 2022.  As Dobbins's second in command, Henderson ratified and carried out the discriminatory police practices that Dobbins imposed on Lexington.  They associated together for the purpose of collecting money from Lexington residents under the threat of detention.

131.    "During Dobbins's year-long tenure, and continuing under Henderson, LPD has

pursued an aggressive approach to policing low-level offenses [and] also make illegal arrests, jailing people for conduct that is not criminal." (Rep. at 2).

132.    The Lexington Police Department's activities affect interstate commerce. Individuals have been stopped while travelling by the Lexington Police Department.

133.    Dobbins and Henderson, and the Lexington Police Department officers, utilized extortion to conduct the affairs of the Lexington Police Department.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment providing the following relief:

- all recoverable damages in amounts to be determined at trial, including compensatory damages, treble damages, punitive damages (individual-capacity claims only), and nominal damages;

- an award of costs, reasonable attorney's fees, and post-judgment interest;

- a declaration that Defendants have violated Plaintiff's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

- a declaration that John Doe 1 unlawfully converted Plaintiff's personal property, in violation of Mississippi state law;

- a permanent injunction against Henderson in his individual capacity and in his official capacity, and against the City of Lexington, enjoining and restraining Defendants from interfering with Plaintiff's rights under the U.S. Constitution and Mississippi law, including (1) by searching, seizing, arresting, and imprisoning Plaintiff without probable cause or on pretextual grounds; (2) by detaining Plaintiff without a prompt probable-cause hearing; and (3) by soliciting or accepting payments of any kind from Plaintiff,

except in strict compliance with local laws and ordinances, the laws and Constitution of

Mississippi, and the laws and Constitution of the United States; and

- such other and further relief as the Court may deem just and appropriate.

**JURY DEMAND**

Plaintiff respectfully demands trial by jury for all triable matters.

Dated: December 18, 2024

By: _____

JOSHUA TOM (MS Bar No. 105392)
ACLU OF MISSISSIPPI
P.O. Box 2242
Jackson, Mississippi 39201
Telephone: (601) 354-3408
Fax: (601) 355-6465
jtom@aclu-ms.org

*Attorney for Plaintiff Deborah Powell*